THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE NEW YORK INSTITUTION FOR THE BLIND, Respondent, *v.* ASHBEL P. FITCH, as Comptroller of the City of New York, Appellant.

*The New York Institution for the Blind — it is a purely educational institution — it is not subject to visitation by the State Board of Charities — right of the institution to recover money from New York city for clothing pupils, residents of New York city.*

The New York Institution for the Blind, incorporated under chapter 214 of the Laws of 1831, " for the purpose of instructing children who have been born blind or who may have become blind by disease or accident," and authorized, by chapter 166 of the Laws of 1870, to receive for care, maintenance, educa-

tion and support, certain blind persons between eight and twenty-five years of age, appointed by the Superintendent of Public Instruction, for a term not to exceed five years, is neither a "charitable" nor "eleemosynary" institution, but is purely educational.

It does not belong to that class of institutions to which payments by counties, cities, towns and villages for the care, support and maintenance of the inmates are forbidden by section 14 of article 8 of the Constitution, unless such inmates are received and retained therein pursuant to rules established by the State Board of Charities.

The "institutions for the deaf and dumb and blind," made subject to visitation by the State Board of Charities by section 11 of chapter 771 of the Laws of 1895, are distinguishable from "institutions for the instruction of the deaf and dumb and blind," made by section 40 of title 15, article 14 of chapter 556 of the Laws of 1894, subject to the visitation of the Superintendent of Public Instruction, and institutions of the latter class are not subject to any rules of the State Board of Charities in respect to the reception and retention of any inmates therein.

APPEAL by the defendant, Ashbel P. Fitch, as comptroller of the city of New York, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 22d day of April, 1896, granting the relator's motion for a peremptory writ of mandamus directing him to audit and pay the claim of the relator under section 3 of chapter 166 of the Laws of 1870, for clothing pupils resident in the city and county of New York who had been received by the relator pursuant to said chapter.

*Theodore Hancock*, for the appellant.

*John M. Bowers*, for the respondent.

Present — Van Brunt, P. J., Barrett, Rumsey, O'Brien and Ingraham, JJ.

Order affirmed, with costs, on opinion of the court below.

The following is the opinion of the court below :

Beekman, J. :

The relator was incorporated under chapter 214, Laws of 1831, "for the purpose of instructing children who have been born blind or who may have become blind by disease or accident." By chapter 166 of the Laws of 1870, the managers of the institution were

authorized to receive for maintenance, education and support, upon the appointment of the Superintendent of Public Instruction for a term not exceeding five years, all blind persons between the ages of eight and twenty-five years, residents of the counties of New York and Kings, acceptable to such managers, upon compensation therefor to be made by the State. The act further provides as follows:

"§ 3. The supervisors of the county of New York or Kings, from which State pupils shall be sent to and received in the said institution, whose parents or guardians shall, in the opinion of the Superintendent of Public Instruction, be unable to furnish them with suitable clothing, are hereby authorized and directed, in every year while such pupils are in said institution, to raise and appropriate fifty dollars for each of said pupils from said counties respectively, and to pay the sum so raised to the said institution, to be by it applied to furnishing such pupils with suitable clothing while in said institution.

"§ 4. If in any year hereafter there shall be any surplus of the amount above required to be paid yearly by the said counties for clothing for pupils from said counties, respectively, then such surplus shall be deducted *pro rata* the ensuing year from the amount above required, to be paid by the said counties respectively."

Under this authority, the city of New York from year to year has paid to this institution the amount so directed to be raised and applied, until the year 1895, when payment was withheld by reason of a claim made by the State Board of Charities that the relator was a charitable or eleemosynary institution, and had not "complied with certain rules and regulations which said board had assumed to make for it under the authority of section 14 of article 8 of the State Constitution." This section reads as follows:

"§ 14. Nothing in this Constitution contained shall prevent the Legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents as to it may seem proper; or prevent any county, city, town or village from providing for the care, support, maintenance and secular education of inmates of orphan asylums, homes for dependent children or correctional institutions, whether under public or private control. Payments by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions, wholly or

584 PEOPLE ex rel. INST. FOR THE BLIND *v.* FITCH.

. First Department, December Term, 1896.                    [Vol. 12.

partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the Legislature. No such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the State Board of Charities. Such rules shall be subject to the control of the Legislature by general laws."

In answer to this claim, the relator contends that it is neither a charitable nor an eleemosynary institution, within the meaning of the section, and is not, therefore, subject to the jurisdiction of said board, or in any way constrained or affected by any rules or regulations which may have been so made. The words " charitable " and " eleemosynary " are practically synonymous, the latter being technically employed to designate a class of corporations organized for charitable purposes (4 Am. & Eng. Ency. of Law, 188), the object of the associated use in the Constitution being, doubtless, to cover in a comprehensive way all charitable enterprises instituted and maintained through corporate or other form of association ; the purpose being to completely cover all institutions designed for the care and relief of those who come under the well-understood definition of objects of charity, namely, persons who, through disease or other disability, are incapable of caring for themselves, and, through lack of means, incapable of securing assistance. For such as these it has become the recognized duty of the State to provide — a duty which in every civilized community is assumed without question, and more or less fully performed. The benevolence of the people has also led to the establishment of institutions administered through private agencies and supplied with funds by individual contribution, which take under their care a very large number of unfortunates who would otherwise become charges upon the State. The propriety, therefore, of State aid to such institutions, where it may rationally be extended, is obvious, and it was for the purpose of securing a proper application and use of the public money thus contributed that the Constitution demands that those receiving it shall be subject to certain rules and regulations adopted by the State Board of Charities — an official body established by section 11 of article 8 of that instrument, and charged with the duty of visiting and inspecting all institutions which are of a " charitable, eleemosynary, correctional or reformatory character."

Not only does the context of the various provisions of the Constitution dealing with the subject show that the institutions referred to as " charitable " and " eleemosynary " were intended to be those which cared for the class of persons to whom I have referred; but the address to the people which was issued by the delegates to the Constitutional Convention of 1894, explanatory of their work, contains this statement, which shows quite clearly in what sense the words under discussion were intended by them to be understood.   In section 13 of the address they say : " We have provided also for regulating and limiting the payment of public money to private institutions for the support of the poor by depriving the Legislature of the power to pass mandatory laws requiring such payments from counties, cities, towns and villages, and by subjecting such expenditures to the control of the State Board of Charities."

It would, therefore, seem to be plain that the institutions, charitable and eleemosynary, within the meaning of the Constitution, are those whose primary object it is to take under their protecting care the destitute poor.   Is the relator such an institution ?   For it is upon the determination of this question that the decision of this application must rest.   I do not think that it is, for the following reasons :   By the very terms of its charter its corporate purpose is limited to " instructing children who have been born blind, or who may have become blind by disease or accident."   It was designed to provide an education through the use of peculiar methods suited to the deprivation of this unfortunate class of persons, which was impossible in the ordinary school room.   The art of such instruction itself was in process of development, and for this, as well as other reasons, there existed a necessity that pupil and teacher should be in constant association under the same roof, each learning from the other.   The function was purely educational, and the advantages which the institution offered were, and still are, desirable and suitable for all persons so afflicted, without regard to their pecuniary condition.   It receives pupils from their parents and guardians, from this State and from other States, but always upon an agreed compensation at rates which it has established.   For this, it supports and maintains as well as educates them, but only because the exigencies of the case require that the pupils should live at the institution.

Nor is the use made of this institution by the State such as falls within its duty in the care of the dependent poor.

Chapter 166 of the Laws of 1870, above referred to, makes it quite plain that the purpose of the institution is purely educational, and that it is a necessary supplement to the free school system, which rests upon an entirely different function of the State. By the terms of the act, State pupils are received "upon the appointment of the Superintendent of Public Instruction." They must also be between eight and twenty-five years of age, the educational period of life, and they must also be "of suitable character and capacity for instruction." For this and the maintenance and support, which is a necessary concomitant, the State is required and agrees to make compensation. It is thus made quite evident that the ruling purpose of all legislation upon the subject is to educate, not to bestow alms. The provisions for maintenance are subordinate and incidental to this object, and are, therefore, insufficient and inappropriate to determine a classification of the institution other than that which its primary object logically requires.

A reference to chapter 556 of the Laws of 1894, entitled "The Consolidated School Law," makes the matter still plainer. Article 14 of title 15 deals with deaf and dumb and blind institutions, and, under section 40 of that title, provides that all institutions for the instruction of the deaf and dumb and the blind shall be subject to the visitation of the Superintendent of Public Instruction, and the scope of his inquiry, which is minutely prescribed, covers every element entering into the well-being of the pupils. By section 41 express provision is also again made for the reception by the relator of State pupils, upon the nomination of the Superintendent of Public Instruction, who is also authorized to require the parents or guardians of the applicants to pay such proportion of the expense of educating and clothing such pupils as they may be able to supply.

The article further declares that the pupils thus provided for shall be designated "State pupils," and that "the regular term of instruction for such pupils shall be five years."

In fact, it is quite plain that the State has undertaken to deal with the education and support of the blind and deaf and dumb as a separate and distinct subject. This is apparent, among other things, from the declaration with which section 14 of article 8 of the

Constitution above quoted opens, and also from section 9 of the same article, which, while forbidding the credit or money of the State from being given or loaned to or in aid of any association, corporation or private undertaking, expressly excepts the right of the Legislature to make " such provision for the education and support of the blind, the deaf and dumb and juvenile delinquents as to it may seem proper."

I have not overlooked the fact that section 11 of chapter 771 of the Laws of 1895, entitled " An act to revise and consolidate the laws relating to the State Board of Charities " provides as follows : "§ 11. Institutions for the deaf and dumb and blind shall be subject to such visitation and inspection by the State Board of Charities as the Constitution provides, but nothing in this act shall be deemed to take from the Comptroller of the State any power which he now has to audit and supervise the expenditures made on account of the institutions for deaf mutes and for the blind." It is noticeable that the Legislature does not undertake to subject such institutions to any other visitation of inspection than that which the Constitution provides, which, as we have seen, is to be exercised by the board only where the institution is " charitable, eleemosynary, correctional or reformatory." When we come to compare this section with the kindred provision contained in the Consolidated School Law, we find there not a reference to institutions for the deaf and dumb and blind, but to " all the institutions for the instruction of the deaf and dumb and blind."

It thus becomes clear that the Legislature was dealing with two classes of institutions in respect to such persons, one where the purpose of the institution was educational, and the other where its object was to maintain and support the indigent deaf and dumb and blind, without regard to their age or capacity for instruction. As there are such institutions in the State, the distinction which is thus made is in harmony with the purposes of both laws, and the distribution of jurisdiction is appropriately made according to the principal objects for which such institutions respectively exist. The class referred to in the school law embraces, as the act itself declares, institutions for educational purposes, while the class mentioned in chapter 771 of the Laws of 1895, which deals with the powers and jurisdiction of the State Board of Charities, includes institutions essentially

charitable or eleemosynary in their nature. The relator is thus treated and classified by the State as one of its educational agencies, agreeably to the constitutional mandate under which the education of the blind is specifically committed to the Legislature in terms free from any restriction which may be found elsewhere in respect to other institutions.

This view is further reinforced by a consideration of other provisions of the law relating to the State Board of Charities. By section 9 the general jurisdiction of that body is particularly defined as follows : " The institutions subject to the supervision, inquiries, inspections and examinations of the State Board of Charities and of its members, officers and inspectors, include reformatories, as aforesaid, asylums or institutions for idiots, for epileptics, poorhouses, almshouses, orphan asylums and all asylums, hospitals (except hospitals, houses and retreats for the insane) and institutions, societies and associations, whether State, county, municipal, incorporated or not incorporated, private or otherwise, which are of a charitable, eleemosynary, reformatory or correctional character or design."

Under well-recognized principles, the institutions thus generally referred to are to be regarded as institutions of like character and class as those which are specifically enumerated ; and the whole section thus serves to express the true scope and application of the words " charitable " and " eleemosynary " as they are employed in the Constitution.

For the reasons which I have given, I have come to the conclusion that, under the Constitution, as well as under the statutes to which I have referred, the Superintendent of Public Instruction alone has the right of visitation over this institution; that it is neither a charitable, eleemosynary, correctional nor reformatory institution within the meaning of the Constitution or the act in relation to the State Board of Charities, and that said board was and is without power to prescribe any rules in respect to the reception and retention of any of the inmates of the institution maintained by the relator.

The motion for a peremptory writ of mandamus is, therefore, granted.